**FOURTH DIVISION**
**MERCIER, C. J.,**
**DILLARD, P. J., and LAND, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

May 29, 2025

# In the Court of Appeals of Georgia

A25A0637. IN THE INTEREST OF J. K., et al., CHILDREN (MOTHER).

DILLARD, Presiding Judge.

Melissa Simpson appeals the juvenile court's termination of her parental rights to her three minor children, arguing the court lacked clear and convincing evidence that the children's dependency would continue. In doing so, the court concluded that severing the parent-child relationships was in their best interests. We vacate the juvenile court's judgment and remand this case for further proceedings consistent with this opinion.

Viewed in the light most favorable to the juvenile court's judgment,[1] the record shows that Simpson is the mother of three minor children—J. K. (12 years old), H. M. (7 years old), and N. S. (3 years old).[2] Simpson initially became involved with the Georgia Division of Family and Children's Services ("DFCS") in 2019 when there were allegations of domestic abuse and concerns about her mental-health issues. Following an investigation, DFCS filed a dependency petition as to J. K. and H. M. (N. S. was not included in the petition because she was not born until January 30, 2021). By that time, DFCS already had an ongoing concern for the children because Simpson had been reluctant to report domestic violence committed by her then-boyfriend. Simpson had also been diagnosed with several mental illnesses, including schizophrenia.

---

[1] *See, e.g.*, *In the Interest of S. O. C.*, 332 Ga. App. 738, 741-42 (774 SE2d 785) (2015).

[2] These were the children's ages when the trial court issued the order being appealed. The juvenile court also terminated the parental rights of James Knight, III, as to J. K. (J. K.'s biological and putative father); Cornelus Hall as to H. M. (H. M.'s biological and putative father); Nathaniel Zebrowski as to N. S. (N. S.'s alleged putative father); and any other unknown, possible putative father of N. S. Even so, Simpson is the only parent at issue in this appeal.

Ultimately, the juvenile court granted DFCS's petition, adjudicating J. K. and H. M. dependent, and temporarily removing the children from Simpson's custody. Then, in 2021 (after N. S. was born), DFCS filed a petition for temporary custody of the child during the pendency of this proceeding. In the petition, DFCS alleged that (1) Simpson was homeless and N. S.'s putative father is unknown; (2) Simpson had a long history with DFCS due to her "unrehabilitated mental health illness" since 2014; (3) in 2019, there were multiple reports of family violence and inadequate supervision, and at one point, one of the children said he thought his father might kill Simpson; and (4) Simpson was unable to care for N. S. after she was born. On April 20, 2021, the juvenile court granted DFCS's petition for temporary custody of N. S., noting that Simpson stipulated to N. S.'s dependency and consented to the child coming to its custody due to "housing, income[,] and mental health issues."

At all relevant times, J. K. was placed with Lorena Josey (his maternal aunt); H. M. was placed with Kimberly Williams (her maternal cousin); and N. S was placed with Jeanette Tullis (her foster mother since birth). Throughout the dependency proceeding, Simpson submitted to several parental-fitness assessments. The most recent assessment noted that Simpson was receiving mental-health treatment for

paranoid schizophrenia, generalized anxiety, and depression, and she was on some medications for those illnesses. There were also allegations that she was a victim of domestic violence inflicted by a live-in boyfriend. Considering all these circumstances, DFCS ultimately recommended that family visits between the children and Simpson—as well as with other family members—continue.

Eventually, on November 28, 2023, DFCS filed a petition—which it later amended—for termination of Simpson's parental rights as to her three children. DFCS alleged that Simpson could not provide proper parental care and control of her children "due to an enduring mental illness that is of such severity and duration that it has rendered her unable to parent her children." DFCS also contended that the children's dependency as to Simpson has not been remedied despite extensive efforts, and the children would be harmed by perpetually remaining in foster care and not acquiring the nurture and support they need and deserve in more permanent placements.

At the hearing on the termination petition, Johnetta Bradley—who was certified as an expert in parental-fitness assessments—testified that she performed an assessment of Simpson on August 18, 2023. Although Simpson expressed "great love and affection" for her children, Bradley's clinical opinion was that—without ongoing mental-health treatment and adequate financial and personal resources—it was doubtful she could successfully parent and support the children independently. And while there was no doubt Simpson loved her children, Bradley did not believe she could "manage" parenting the children financially, emotionally, and mentally.

Trenisha Hallmon—the children's DFCS case manager—testified that she visited the children monthly, interacted with them, and reviewed all of the pertinent records. She added that when the children came into DFCS custody in 2019, they were deemed dependent based on lack of parental care, independent control, all of Simpson's mental-health problems, and domestic violence. At the hearing on this matter, Bradley told the court J. K. was "doing great" in his placement with his maternal aunt and said that he does not want to leave. H. M. was also doing well in her placement with a cousin; and although she had some behavioral challenges, DFCS is "working through those challenges." And N. S.—who was only three years old at the

time of the hearing—was not placed with a relative, but "might as well be." Bradley explained that Simpson was required to complete a psychological evaluation, and the evaluator recommended the children remain in DFCS custody until she could provide a stable home environment, and as long as she continued taking psychotropic medications.

At the time of the termination, Simpson was living with her sister because she did not feel like she could continue living alone (in light of her mental-health challenges). Indeed, while Simpson had substantially completed her case plan "to the best of her ability," her mental-health needs had not yet been remedied because they required "ongoing treatment." But by December 2023, Simpson was non-compliant with several medications and reported that she was experiencing depression and hopelessness. Then, in January 2024, Simpson was unable to spell the word "world" backwards, had short-term memory loss, and was still non-compliant with taking her medications. Ultimately, the DFCS case worker testified that Simpson was not able

to provide parental care and support for her children, at least not independently and for a "long period of time." And given the children's attachment to their foster parents and individualized need for permanence, stability, and relationships, the case worker believed terminating Simpson's parental rights was in their best interests.

After a hearing, the trial court granted DFCS's termination petition in a lengthy and detailed order. We then granted Simpson's application for a discretionary appeal.

Simpson's sole argument is that the juvenile court erred in terminating her parental rights as to her three children because it lacked clear and convincing evidence to support its decision to do so. As a result, she contends the court also erred in determining that terminating her parental rights was in their best interests. But because the court failed to include certain required findings in its order, we vacate that order and remand for further proceedings consistent with this opinion.

On appeal from a termination order, we view the evidence "in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated."[3] In doing so, we do not "weigh the evidence or resolve

---

[3] *In the Interest of S. O. C.*, 332 Ga. App. at 741-42 (punctuation omitted).

7

credibility issues . . . ."[4] Even so, this deferential standard of review is necessarily "tempered by the fact that there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship."[5] This life-altering decision, then, must be "scrutinized deliberately and exercised most cautiously."[6] Indeed, the right to raise one's children as they see fit is "a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[7] With these important guiding principles in mind, we turn now to Simpson's specific claims of error.

---

[4] *In the Interest of C. S.*, 354 Ga. App. 133, 136 (840 SE2d 475) (2020) (punctuation omitted).

[5] *In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (805 SE2d 285) (2017) (punctuation omitted); *accord In the Interest of D. M.*, 339 Ga. App. 46, 46 (793 SE2d 422) (2016).

[6] *In the Interest of E. G. L. B.*, 342 Ga. App. at 840 (punctuation omitted); *accord In the Interest of D. M.*, 339 Ga. App. at 46.

[7] *In the Interest of E. G. L. B.*, 342 Ga. App. at 840 (punctuation omitted); *accord In the Interest of D. M.*, 339 Ga. App. at 46.

As previously noted, Simpson maintains the trial court erred in finding there was clear and convincing evidence to support the termination of her parental rights and that doing so was in her children's best interests. And for the following reasons, we vacate the juvenile court's order and remand for further proceedings consistent with this opinion.

In Georgia, a juvenile court's termination of parental rights "involves a two-step process."[8] First, under OCGA § 15-11-310 (a), the court must determine "whether one of the five statutory grounds for termination has been met."[9] Crucially, these grounds are independent, and so if "there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm."[10] Then, if the court determines one or more of the statutory grounds has been satisfied,

---

[8] *In. The Interest of S. O. C.*, 332 Ga. App. at 742 (punctuation omitted).

[9] *In the Interest of D. C. S.*, 371 Ga. App. 186, 196 (1) (b) (899 SE2d 834) (2024); *see* OCGA § 15-11-310 (a) (setting forth five grounds on which a juvenile court can terminate parental rights).

[10] *In the Interest of D. C. S.*, 371 Ga. App. at 196 (1) (b) (punctuation omitted); *see In the Interest of M. M. D.*, 356 Ga. App. 653, 659 (5) (848 SE2d 687) (2020) ("[T]he different grounds for terminating parental rights under OCGA § 15-11-310 (a) are independent, and thus, on appeal, if there is sufficient evidence supporting any one of these grounds, we need not consider the other grounds in order to affirm." (punctuation omitted)).

it must then move on to the next step, which "involves a determination of whether the termination is in the child's best interest based on consideration of factors set out in OCGA §§ 15-11-26 and 15-11-310 (b), or any other factors the court considers relevant."[11]

Here, Simpson claims the juvenile court erred in failing to "explicitly address whether or how a permanency plan short of termination and adoption would expose the children to continued dependency." We agree. When a court assesses "whether a child now in foster care is likely to suffer serious harm as a result of continued [dependency][12], the court must consider not only *the likelihood of [individualized]*

---

[11] *In the Interest of D. C. S.*, 371 Ga. App. at 196 (1) (b); *see* OCGA § 15-11-310 (b) (setting forth seven factors the juvenile courts must consider in determining whether termination of parental rights is authorized, the last of which includes factors set forth in OCGA § 15-11-26); OCGA § 15-11-26 (setting forth 20 factors a juvenile court must consider "[w]henever a best[-]interests determination is required").

[12] The former Juvenile Code "authorized a juvenile court to award custody to the Department of any minor child shown to be 'deprived.'" *In the Interest of S. C. S.*, 336 Ga. App. 236, 244 n.4 (784 SE2d 83) (2016). But the current Juvenile Code, which applies in this case, "uses the word 'dependent' in lieu of 'deprived.'" *Id.*; *see* OCGA § 15-11-16 (a) (3) (providing that a proceeding under the new Juvenile Code "may be commenced . . . [b]y the filing of a complaint or a petition as provided in Article[ ] 3 ... of [the current Juvenile Code]," which governs dependency proceedings). Nevertheless, given the similarities between the definition of a "deprived child" and that of a "dependent child," we have found that "our previous decisions addressing the deprivation of a child are relevant to appeals involving the

*harm if the child remains indefinitely in foster care*, but also the likelihood of harm if the child returns to the custody of his parent, notwithstanding that the [dependency] persists."[13] And this dual consideration makes perfect sense because "the statute requires the State to show that continued dependency—not merely a specific arrangement for the child—will cause harm."[14] Even so, dependency will "cause harm only if all of the options available to DFCS short of termination—keeping the child in foster care, or returning the child to the parent—will themselves cause harm."[15]

To be sure, we do not doubt that many children—especially older children—"suffer emotional stress and sadness from the uncertainty [that can, in certain cases, result from being] in foster care."[16] Nevertheless, this is not nearly enough "to show that continuing the legal relationship of parent and child is

---

dependency of a child." *In the Interest of S. C. S.*, 336 Ga. App. at 244 n.4.

[13] *In the Interest of E. M. D.*, 339 Ga. App. 189, 201 (II) (B) (793 SE2d 489) (2016) (punctuation omitted) (emphasis supplied); *accord In the Interest of R. S. T.*, 345 Ga. App. 300, 322 (1) (812 SE2d 614) (2018).

[14] *In the Interest of E. M. D.*, 339 Ga. App. at 201 (II) (B).

[15] *In the Interest of E. M. D.*, 339 Ga. App. at 205 (II) (B); *accord In the Interest of A. F.*, 346 Ga. App. 538, 544 (816 SE2d 496) (2018).

[16] *In the Interest of E. M. D.*, 339 Ga. App. at 205 (II) (B).

inherently harmful to the children."[17] As a result, when the evidence shows the mother and children are "bonded and emotionally close . . . , the lack of *specific* evidence regarding potential harm mandates reversal even more strongly."[18] But importantly, we have also held that a finding dependency is likely to continue "does not *necessarily* justify a finding that a child's continued dependency will harm the child, although such a finding of dependency could support a finding of harm in particular circumstances."[19] Simply put, whether returning the child to the parent would cause harm matters little if "there is no evidence that the child is likely to experience serious harm under the [uneasy] status quo."[20] Suffice it to say, a mother's

---

[17] *In the Interest of E. M. D.*, 339 Ga. App. at 205 (II) (B); *see In the Interest of D. M.*, 339 Ga. App. at 56 (2) (a) ("Without *specific* factual findings as to [the children] on the question of the likelihood of serious harm from continued deprivation, we have no basis to evaluate whether the juvenile court properly determined that clear and convincing evidence supported the court's conclusion on that issue." (punctuation omitted)).

[18] *In the Interest of E. M. D.*, 339 Ga. App. at 205-06 (II) (B) (punctuation omitted); *accord In the Interest of D. P.*, 326 Ga. App. 101, 114 (3) (b) (756 SE2d 207) (2014).

[19] *In the Interest of E. M. D.*, 339 Ga. App. at 200 (II) (B) (punctuation omitted); *accord In the Interest of L. P.*, 339 Ga. App. 651, 656 (2) (794 SE2d 252) (2016).

[20] *In the Interest of E. M. D.*, 339 Ga. App. at 201-02 (II) (B); *accord In the Interest of R. E. M. B.*, 374 Ga. App. 564, 571 (1) (a) (v) (913 SE2d 425) (2025).

inability to care for her children "does not necessarily mean that her current relationship with them is detrimental."[21]

Additionally, in considering whether there is evidence that remaining in foster care will cause serious harm to a child, this Court has examined both "(1) the extent to which instability and impermanency are currently causing specific harms to the child[;] and (2) whether the parent's current relationship with the child is itself detrimental."[22] And an order terminating parental rights must contain *"explicit* findings supporting the conclusion that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child."[23] Critically, the evidence must show "*how each individual child* will be harmed by the

---

[21] *In the Interest A. T.*, 271 Ga. App. 470, 473 (610 SE2d 121) (2005) (punctuation omitted); *accord In the Interest of D. F.*, 251 Ga. App. 859, 862 (555 SE2d 225) (2001).

[22] *In the Interest of E. M. D.*, 339 Ga. App. at 201-02 (II) (B) (punctuation omitted); *accord In the Interest of A. F.*, 346 Ga. App. at 544.

[23] *In the Interest of A. S.*, 339 Ga. App. 875, 881 (3) (794 SE2d 672) (2016) (punctuation omitted) (emphasis supplied); *accord In the Interest of D. M.*, 339 Ga. App. at 55 (2) (a).

status quo to the degree necessary to justify termination of the mother's parental rights."[24]

Here, while the juvenile court's detailed order appears to comply generally with the requirements of Georgia law, it did not make *explicit, specific findings* about each of Simpson's children individually and whether they would suffer *individualized* harm from maintaining the uneasy status quo.[25] To be sure, the court delineated several factual findings as to Simpson and the children collectively, and concluded that returning the children to Simpson would be detrimental or harmful to them (which Simpson appears to concede), but it did not make specific findings regarding whether each child *individually* would be harmed by remaining in their current placements. So, while we are certainly concerned by the mother's ongoing mental-health struggles,

---

[24] *In the Interest of A. S.*, 339 Ga. App. at 881-22 (3) (punctuation omitted) (emphasis supplied); *see In the Interest of T. R.*, 358 Ga. App. 369, 377 (2) (855 SE2d 389) (2021) ("Without specific factual findings as to the children *individually* on the question of the likelihood of serious harm from continued deprivation, we have no basis to evaluate whether the juvenile court properly determined that clear and convincing evidence supported the court's conclusion on that issue." (punctuation omitted) (emphasis supplied)).

[25] *See supra* note 24 & accompanying text.

"and question whether she will ever be able to regain custody of her children[,]"[26] the court is still required to make the requisite findings detailed above. And doing so is no mere formality. It ensures that parents' fundamental, constitutional right to familial relations are safeguarded from arbitrary governmental interference into the private realm of family life.[27]

---

[26] *In the Interest of A. S.*, 339 Ga. App. at 882 (3).

[27] *See In the Interest of D. C. S.*, 371 Ga. App. 186, 206 (899 SE2d 834) (2024) (Dillard, P. J., concurring) (noting that "in every parental-rights case, we must be ever mindful of the long-standing, fundamental principle that parents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children. As our Supreme Court has rightly emphasized, there can scarcely be imagined a more fundamental right than the right of a natural parent to his or her offspring. And the fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents." (cleaned up)); *see Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d 769 (1995) (noting that "[t]he U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference."); *In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) (noting that "[t]he presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation and citation omitted)); *see also* Richard W. Garnett, *Taking Pierce Seriously: The Family, Religious Education, and Harm to Children*, 76 Notre Dame L. Rev. 109, 114 (I) (2000).

For all these reasons, we vacate the juvenile court's order terminating Simpson's parental rights and remand this case for further proceedings consistent with this opinion.[28]

*Judgment vacated and case remanded with direction. Mercier, C.J., and Land, J., concur.*

---

[28] *See McQueen v. Long*, 372 Ga. App. 840, 844 (906 SE2d 909) (2024) ("[W]e may remand a case for further factual findings when the trial court's order lacks sufficient detail to enable meaningful appellate review."(punctuation omitted)); *Parnell v. Sherman & Hemstreet, Inc.*, 364 Ga. App. 205, 211-12 (2) (a) (874 SE2d 394) (2022) (vacating and remanding because trial court did not make explicit finding or rule upon whether party's petition for temporary injunction was sufficiently verified); *Flanders v. State*, 360 Ga. App. 855, 855-56 (862 SE2d 152) (2021) (vacating and remanding to trial court when trial court "did not rule on, make factual findings regarding, or even mention" defendant's claim that State failed to turn over exculpatory evidence); *see also Weintraub v. State*, 352 Ga. App. 880, 889 (1) (836 SE2d 162) (2019) ("Our Supreme Court has instructed that we may remand for further factual findings where the trial court's order lacks sufficient detail to enable meaningful appellate review.").